IN THE COMMONWEALTH COURT OF PENNSYLVANIA

City of Lancaster, Borough of Carlisle, :
and Borough of Columbia, :
               Petitioners :
                :
                : No.  251 M.D. 2019
         v. :
                : Argued:  December 12, 2019
Pennsylvania Public Utility :
Commission, :
               Respondent :


BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE MICHAEL H. WOJCIK, Judge
              HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


***OPINION NOT REPORTED***

MEMORANDUM OPINION
BY JUDGE McCULLOUGH                FILED:  February 21, 2020


Before this Court in our original jurisdiction are the preliminary objections (POs) of the Pennsylvania Public Utility Commission (PUC or Commission) to the petition for review (PFR) filed by the City of Lancaster, Borough of Carlisle, and Borough of Columbia (collectively, Municipalities).  For the reasons that follow, we sustain the POs in part and overrule them in part and, in so determining, dismiss Count I with prejudice and permit Count II to proceed.

## Background

On April 29, 2019, the Municipalities filed a PFR in the nature of a complaint seeking relief under the Declaratory Judgments Act[1] and averred as follows.

The Municipalities have each created Historic Districts pursuant to what is commonly known as the Historic District Act (Act).[2] Through the enactment of ordinances, the Municipalities have established rules and regulations applicable in their Historic Districts (Historic District Ordinances). (PFR, ¶¶8-14.)

> 15. The Municipalities, including properties located in the Historic Districts, are served by a natural gas distribution company [NGDC], operating pursuant to the rules and regulations of the PUC.
>
> 16. Section 59.18 of the PUC's regulations, 52 Pa. Code §59.18 [52 Pa. Code §59.18 or Section 59.18] contains the PUC's regulations for gas meter, regulator, and service line location.
>
> 17. On May 22, 2014, the PUC adopted a final rulemaking order amending 52 Pa. Code §59.18 (the "Final Rulemaking Order").
>
> 18. Prior to its amendment by the Final Rulemaking Order, Section 59.18 permitted meters to be located: "[i]nside the building, preferably in a dry, well-ventilated place not subject to excessive heat, and as near as possible to the point of entrance of the pipe supplying service to the building."
>
> 19. In its Final Rulemaking Order, the PUC amended Section 59.18 to require: "[u]nless otherwise allowed or

---

[1] 42 Pa.C.S. §§7531-7541.

[2] Act of June 13, 1961, P.L. 282, No. 167, *as amended*, 53 P.S. §§8001-8006.

2

required in this section, meters and regulators must be located outside and aboveground." 52 Pa. Code §59.18(a)(1).

20.     Section 59.18(d) permits utilities to locate meters in the interior of buildings under certain limited circumstances . . . .[3]

---

3 In pertinent part, 52 Pa. Code §59.18 provides as follows:

§59.18. Meter, regulator and service line location.

(a) *General requirements for meter and regulator location.*

(1) Unless otherwise allowed or required in this section, meters and regulators must be located outside and aboveground.

\*       \*       \*

(d) *Inside meter locations.*

(1) Inside meter locations shall be considered only when:
(i) The service line pressure is less than 10 psig [pounds per square inch].
(ii) A meter is located in a building that meets one of the following criteria:
(A) A building is listed in the National Register of Historic Places or the customer or building owner notifies the utility that the building is eligible to be listed in the National Register of Historic Places and the eligibility can be readily confirmed by the utility.
(B) A building is located within a historic district that is listed in the National Register of Historic Places or the customer or building owner notifies the utility that the historic district is eligible to be listed in the National Register of Historic Places and the eligibility can be readily confirmed by the utility.
(C) A building has been designated as historic under the [Act] or a municipal home rule charter.
(D) A building is located within a locally designated historic district or is eligible for the listing, or a building is individually designated under a local ordinance as a historic landmark or is eligible for the listing.

**(Footnote continued on next page…)**

3

21. The [NGDC] serving the Municipalities has commenced, in all three municipalities, a meter relocation program pursuant to [52 Pa. Code §59.18].

22. The [NGDC] serving the Municipalities has relocated meters from the interior of buildings to the exterior of buildings in the Historic Districts of all three municipalities.

23. Under [52 Pa. Code §59.18], the PUC is vested with absolute discretion in the [NGDC], allowing the [NGDC] to perform its meter relocations without complying with the Historic District Ordinances and with no regard for the effect on the Historic Districts.

\* \* \*

43. In applying Section 59.18 within the territorial limits of the Municipalities, the PUC has required utilities to locate meters in exterior locations in the Historic Districts without consideration of the Historic District Ordinances.

44. The [NGDC] serving the Municipalities has relocated meters to exterior locations in the Historic Districts without consideration for the Historic District Ordinances or the effect on the Historic Districts.

(PFR, ¶¶15-23, 43-44.)

In Count I, the Municipalities allege that 52 Pa. Code §59.18 contravenes article I, section 27 of the Pennsylvania Constitution, Pa. Const. art. I,

---

**(continued…)**

(iii) Protection from ambient temperatures is necessary to avoid meter freeze-ups.
(iv) A utility determines that a meter is subject to a high risk of vandalism based on the utility's prior experience.
(v) A utility determines that an outside meter location is neither feasible nor practical.

52 Pa. Code §59.18(a), (d)(1).

§27, known as the Environmental Rights Amendment (ERA).[4] The Municipalities aver that 52 Pa. Code §59.18 "fails to protect the historic resources of the Commonwealth," (PFR, ¶41), in the following particulars:

> a.      Making interior location of meters in historic districts the exception, rather than the rule.
>
> b.      Failing to set standards a utility must follow when installing a meter in a historic district, to protect historic resources.
>
> c.      Leaving ultimate determination of the location of meters in historic districts at the sole discretion of the public utility.
>
> d.      Purporting to exempt public utilities from local historic district requirements.
>
> e.      Failing to require public utilities to comply with local historic district permitting requirements.
>
> f.      Failing to define the "consideration" required of public utilities when locating meters in historic districts.
>
> g.      The word "only" in the introductory sentence to Section 59.18(d)(1) suggests that whether or not a utility need even consider indoor meter location in historic districts is entirely at its discretion . . . .

---

[4] This constitutional proviso provides:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment.  Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall preserve and maintain them for the benefit of all the people.

Pa. Const. art. I, §27.

h.     The word "only" in the foregoing sentence discourages indoor meter location in historic districts.

(PFR, ¶41(a)-(h).)   For relief, the Municipalities request an order declaring 52 Pa. Code §59.18 unconstitutional and decreeing "that the placement of meters shall be subject to any ordinance properly adopted by a Pennsylvania municipality pursuant to the [] Act."  (PFR, Count I, Wherefore clause.)

In Count II, the Municipalities assert that 52 Pa. Code §59.18 constitutes an improper "sub-delegation" of legislative authority to private entities, *i.e.*, NGDCs. According to the Municipalities, "the PUC has granted public utilities unfettered discretion to determine whether meters will be located on the interior or exterior of homes in historic districts within the territorial limits of the Municipalities" and, therefore, 52 Pa. Code §59.18 "is an invalid and unconstitutional sub[-]delegation of its statutorily-imposed obligation to make and enforce regulations not contrary to law."  (PFR, ¶¶55, 57.)  For relief, the Municipalities request an order declaring 52 Pa. Code §59.18 unconstitutional and decreeing "that the placement of meters shall be subject to any ordinance properly adopted by a Pennsylvania municipality pursuant to the [] Act."  (PFR, Count II, Wherefore clause.)

On June 26, 2019, the PUC filed six POs.  Initially, the PUC asserted a demurrer to Count I, contending that this cause of action, as pled, is legally insufficient and effectively foreclosed based upon preemption principles and our decision in *UGI Utilities, Inc. v. City of Reading*, 179 A.3d 624 (Pa. Cmwlth. 2017). The PUC further asserted that Counts I and II should be dismissed because the Municipalities failed to exhaust available administrative remedies and failed to join a necessary party, *i.e.*, the NGDC that allegedly refused to locate gas meters inside certain buildings.  In addition, the PUC contended that Counts I and II should be dismissed on the grounds that the Municipalities failed to aver facts sufficient to

6

demonstrate that they sustained direct and immediate harm; the allegations are legally insufficient to justify pre-enforcement review of 52 Pa. Code §59.18; and the Municipalities are seeking an advisory opinion in that they have not alleged the existence of an actual case or controversy.

On August 9, 2019, the Municipalities filed an answer to the POs. Thereafter, the parties filed briefs in support of their respective positions. On December 12, 2019, this Court entertained oral argument on the POs. We now turn to the merits of those POs.

## Discussion[5]

### PO No. 1

In its first PO, the PUC contests the legal sufficiency of Count I, contending that the averments fail to state a claim upon which relief can be granted. The PUC asserts that in *PPL Electric Utilities Corp. v. City of Lancaster*, 214 A.3d 639 (Pa. 2019), our Supreme Court broadly held that the General Assembly intended its regulatory framework to occupy the entire area of utility regulation at the state level. Consequently, the PUC submits, as a matter of "field preemption," its regulations, including 52 Pa. Code §59.18, supersede any local regulation or ordinance that falls within the ambit of that field. From this premise, the PUC argues

---

[5] In reviewing preliminary objections, all material facts averred in the petition for review, and all reasonable inferences that can be drawn from them, are admitted as true. *Vattimo v. Lower Bucks Hospital, Inc.*, 465 A.2d 1231, 1232 (Pa. 1983); *Fletcher v. Pennsylvania Property & Casualty Insurance Guaranty Association*, 914 A.2d 477, 479 n.2 (Pa. Cmwlth. 2007), *aff'd*, 985 A.2d 678 (Pa. 2009). However, a court need not accept as true conclusions of law, unwarranted inferences, argumentative allegations, or expressions of opinion. *Portalatin v. Department of Corrections*, 979 A.2d 944, 947 (Pa. Cmwlth. 2009). "Preliminary objections should be sustained only in cases that are clear and free from doubt." *Pennsylvania AFL-CIO v. Commonwealth*, 757 A.2d 917, 920 (Pa. 2000).

7

that "the Municipalities failed to reconcile that the [ERA] was [not] enacted until 1971 and that it is silent on the impacts of long-standing, pre[]existing law involving regulation of public utilities without expressly referring to the topic." (PUC's Br. at 12.) At its essence, the PUC maintains that the ERA does not apply to its regulations given the longstanding and broad nature of the grant of legislative authority that the General Assembly has bestowed upon it as a regulatory agency.

In addition, the PUC relies on our decision in *City of Reading* and reads that case as barring (or, at bare minimum, severely undermining) the Municipalities' claim that 52 Pa. Code §59.18 flouts the ERA. Addressing the merits of the Municipalities' ERA claim in a more direct fashion, the PUC contends that

> the Municipalities' argument as to the constitutionality of Section 59.18 relies completely on the historical aesthetic of the alleged affected buildings. It is not the intent of Section 59.18 to diminish the aesthetic of historic buildings, but instead its intent is to protect those historic buildings from having an inside gas meter that would pose a risk of exploding. In this respect, Section 59.18 serves to fully carry out[6] the spirit of the [ERA] in that it ultimately seeks to protect these historic buildings from having an unsafe gas meter location that could increase the risk of explosion.

(PUC's Br. at 13-14.)

In response, the Municipalities concede that, as a general matter, the regulation of utilities is a matter of statewide concern, the legislative efforts in the area are entitled to the status of field preemption and, pursuant to this principle and our decision in *City of Reading*, the Historic District Ordinances are preempted. The Municipalities, however, distance their legal challenge from the preemption doctrine,

---

[6] The Court expresses no view on the current debate among (or amongst) the grammaticians surrounding the so-called "split infinitive."

8

arguing that the case law cited and relied upon by the PUC is inapposite because those cases "dealt with the question of whether a local ordinance was preempted by [a] PUC regulation" and "[t]he validity of the PUC regulation was not in question." (Municipalities' Br. at 15.) The Municipalities assert that here, by contrast, the "question posed . . . is whether [a] PUC regulation is valid," *id.* at 17, and for support, they cite authority from this Court holding that the PUC, as a regulatory body, is bound by and must adhere to the constitutional restrictions imposed by the ERA.

With respect to our decision in *City of Reading*, the Municipalities contend that any discussion in that case regarding the interplay between 52 Pa. Code §59.18 and the ERA was merely *dicta*. The Municipalities also devote a notable portion of their brief advancing the argument and explaining why the ERA applies to the regulations promulgated by the PUC and how the ERA encompasses and protects the "historic resources" of the Commonwealth, which necessarily includes buildings that have been designated as having cultural significance at the local level. While the Municipalities assert that the PUC is acting as a "trustee" of these "historic resources," and emphasize that 52 Pa. Code §59.18 is subject to their facial challenge under the ERA, the Municipalities fail to argue, on a substantive level, that they have alleged a colorable claim on the merits. Further, in their PFR and brief in opposition to the POs, the Municipalities do not point to any provision of the Historic District Ordinances that is in conflict with 52 Pa. Code §59.18 or would otherwise have an allegedly beneficial effect on the buildings they claim are "historical resources."

As a preliminary matter, we note that in their request for relief for Count I (and also Count II), the Municipalities, in part, seek an order decreeing "that the placement of meters shall be subject to any ordinance properly adopted by a Pennsylvania municipality pursuant to the [] Act." (PFR, Count I, Wherefore clause.)

9

However, even if the Court were to conclude that 52 Pa. Code §59.18 was unlawful or invalid, as a practical matter, it is likely that the Historic District Ordinances would still be preempted and thus inoperable. This is because, in enacting the Public Utility Code,[7] the General Assembly intended to occupy the entire regulatory field, and the net result is that "we must reject all local regulation fairly encompassed by that field." *PPL Electric Utilities Corp.*, 214 A.3d at 655. Our Supreme Court has already concluded that "matters pertaining to the location of utility facilities lie within the ambit of the PUC's regulatory authority" and that, therefore, ordinances pertaining to the "relocation and removal of utility facilities [] lie within the preempted field." *Id.* at 655-56. Nonetheless, and notwithstanding the apparent preemption of the Historic District Ordinances, the Municipalities also seek a declaration that 52 Pa. Code §59.18 runs afoul of the ERA. On this note, if the Court were to deem this regulation unlawful and invalid, it is quite possible that the PUC would lack the legal authority to require meters to be located outside of a structure and above ground, irrespective of whether the Historic District Ordinances would remain preempted. We conclude, therefore, that preemption principles do not serve as a complete obstacle to the Municipalities' ERA claim.

We thus turn to the merits of the Municipalities' ERA claim. In *Pennsylvania Environmental Defense Foundation v. Commonwealth*, 161 A.3d 911 (Pa. 2017) (*PEDF*), our Supreme Court reaffirmed the legal principles pronounced by a plurality of the court in *Robinson Township v. Commonwealth*, 83 A.3d 901 (Pa. 2013) (plurality). In *PEDF*, our Supreme Court observed that the third sentence of the ERA "establishes a public trust, pursuant to which the natural resources are the corpus of the trust, the Commonwealth is the trustee, and the people are the named

---

[7] 66 Pa.C.S. §§101-3316.

10

beneficiaries." *PEDF*, 161 A.3d at 931-32. The Supreme Court also clarified that "[t]rustee obligations are not vested exclusively in any single branch of Pennsylvania's government, and instead *all agencies and entities of the Commonwealth government, both statewide and local, have a fiduciary duty to act toward the corpus with prudence, loyalty, and impartiality.*" *Id.* at 931 n.23 (emphasis added). Indeed, as correctly noted by the Municipalities in their brief, there are "several cases in which this Court has [] subjected the PUC to review pursuant to [the ERA]." (Municipalities' Br. at 18-19.)[8] Therefore, insofar as the PUC contends that because its statutory authority as a public utility predates the ERA, the Municipalities cannot challenge 52 Pa. Code §59.18 under the ERA, we find that this argument lacks merit.

Having concluded that the ERA applies to the PUC and that 52 Pa. Code §59.18 must comply with the mandate of the ERA, we now determine whether the Municipalities have pled a cognizable claim thereunder.

---

[8] Citing *Energy Conservation Council of Pennsylvania v. Public Utility Commission*, 25 A.3d 440, 446-47 (Pa. Cmwlth. 2011) ("Any decision by the PUC as to the environmental impact of [high-voltage] lines must be set against the backdrop of Article I, Section 27, of the Pennsylvania Constitution."); *O'Connor v. Pennsylvania Public Utility Commission*, 582 A.2d 427, 430-33 (Pa. Cmwlth. 1990) (addressing an ERA challenge to the PUC's approval of an electric company's application to obtain an exemption from local zoning laws for a proposed facility); *Del-AWARE Unlimited, Inc. v. Pennsylvania Public Utility Commission*, 513 A.2d 593, 595 (Pa. Cmwlth. 1986) (same, with respect to the PUC's approval of the siting for a pumphouse).

We recognize that, in the decisions cited by the Municipalities, this Court applied the three-fold test developed in *Payne v. Kassab*, 312 A.2d 86 (Pa. Cmwlth. 1973) (en banc), to determine whether a violation of the ERA had occurred, a test which was subsequently disapproved and overruled by our Supreme Court in *PEDF*. In any event, these cases reflect the general point that the PUC and its adjudicatory decisions and regulations are subject to the ERA, which is consonant with the Supreme Court's statement in *PEDF* that all agencies of the Commonwealth are bound by the ERA.

Seemingly, consistent with the plain language of the ERA itself, *see supra* note 4, our Supreme Court has endorsed the view that "historical sites" are considered part of our "public natural resources" for purposes of the ERA and, thus, "are subject to the same consideration as strictly environmental resources." *United Artists' Theater Circuit, Inc. v. City of Philadelphia*, 635 A.2d 612, 620 (Pa. 1993) (quoting *Commonwealth v. National Gettysburg Battle Tower, Inc.*, 311 A.2d 588, 595 (Pa. 1973) (Roberts, J., concurring)). As such, we assume that the PUC, as a trustee, has a duty to administer the trust with prudence, which involves consideration of the purposes and circumstances of the trust and requires the exercise of reasonable care, skill, and caution when dealing with the corpus of the trust, *i.e.*, the buildings in the Historic Districts protected by the Historic District Ordinances. *PEDF*, 161 A.3d at 932 & n.24. More specifically, the ERA imposes upon the PUC "a duty to prohibit the degradation, diminution, and depletion of our public natural resources, whether these harms might result from direct state action or from the actions of private parties." *Id.* at 933.

At its core, the ERA "protects the people from governmental action that unreasonably causes actual or likely deterioration" of the public natural resources. *Robinson Township*, 83 A.3d at 953. Stated in somewhat different terms, "to achieve recognition of the[] rights enumerated in the first clause of [the ERA] as 'inviolate' necessarily implies that economic development [or some other regulatory measure] cannot take place at the expense of an unreasonable degradation of the [public nature resources]." *Id.* at 954. Instead, "when government acts, the action must, on balance, reasonably account for the [historical] features of the affected locale." *Id.* at 953. Recently, in *Frederick v. Allegheny Township Zoning Hearing Board*, 196 A.3d 677 (Pa. Cmwlth. 2018) (en banc), this Court formulated the test to be used under the

ERA.  We concluded that judicial review of governmental action entails a two-step inquiry "to determine, first, whether the values in the first clause of the [ERA] are implicated and, second, whether the governmental action unreasonably impairs those values."  196 A.3d at 695.

Notably, as pertains here, 52 Pa. Code §59.18—which, despite being administrative in nature, is legislative in character—is presumed to be constitutional, and the challenger carries the duty and heavy burden of proving otherwise.  *See Department of Environmental Resources v. Metzger*, 347 A.2d 743, 745 (Pa. Cmwlth. 1975).  In this case, the Municipalities, by their own insistence, mount a facial challenge to the constitutionality of 52 Pa. Code §59.18.  *See* Municipalities' Br. at 25 ("[T]he Municipalities' [PFR] is a facial challenge to Section 59.18.").  As our Supreme Court has acknowledged, a facial challenge will fail where the law has a plainly legitimate sweep.  *Clifton v. Allegheny County*, 969 A.2d 1197, 1223 (Pa. 2009).

Under 52 Pa. Code §59.18(a)(1), the general rule is that "[u]nless otherwise allowed or required in this section, meters and regulators must be located outside and aboveground."  *Id.*  With respect to choosing the location of the meters, the regulation, in pertinent part, provides the following guideposts:  "(5) When selecting a meter or service regulator location, a utility shall consider potential damage by outside forces";  "(6) The meter location must accommodate access for meter reading, inspection, repairs, testing, changing and operation of the gas shut-off valve"; and "(7) When feasible and practical to do so, the meter location must accommodate the installation of the service line in a straight line perpendicular to the main."  52 Pa. Code §59.18(a)(5)-(7).

13

In prohibitory language, the regulation further states that "(8) Meters and service regulators may not be installed in the following locations": "(i) Beneath or in front of windows or other building openings that may directly obstruct emergency fire exits," "(ii) Under interior stairways," "(iii) Under exterior stairways, unless an alternate means of egress exists and the meter and service regulator are installed in a well-vented location under stairs constructed of noncombustible material," "(iv) A crawl space," "(v) Near building air intakes under local or State building codes," or "(vi) In contact with soil or other potentially corrosive materials." 52 Pa. Code §59.18(a)(8)(i)-(vi).

Additionally, pursuant to 52 Pa. Code §59.18(b), governing outside meter or regulator locations, "[o]utside meters or service regulators shall be installed in one of the following locations": (1) "When feasible and practical to do so, aboveground in a protected location adjacent to the building served, or as close as possible to the point where a production or transmission line is tapped"; or "(2) In a buried vault or meter box." 52 Pa. Code §59.18(b)(1)-(2).

Here, upon our review of these regulatory provisions, we conclude that while 52 Pa. Code §59.18, on its face, may "implicate" the preservation of historic values, the Municipalities have failed to allege facts sufficient to establish that the regulation, more likely than not, has or will result in an "unreasonable degradation" of these values. To be sure, the Municipalities aver that specific action has been taken by an NGDC to relocate meters in exterior locations in the Historic Districts. (PFR, ¶¶21-22, 43-44.) However, there is no allegation in the PFR that the buildings

14

in these Historic Districts have suffered any type of specific, or even symbolic, harm or degradation to the aesthetic/scenic or concrete values that they represent or depict.[9]

In any event, the "particulars," or manners in which the Municipalities have averred that 52 Pa. Code §59.18 has brought or will bring about resulting harm, standing alone, are simply too abstract to demonstrate that it is reasonably likely that some type of harm has or will occur. Likewise, the mere placement of a meter on the outside, aboveground portion of a building in a Historic District in one of the places enumerated in the regulation does not provide support for a conclusion that harm will necessarily follow. Comparatively, this is in stark contrast to the facial challenge that there would be unavoidable and inevitable consequences to the environment from the oil and gas operations conducted under section 3304 of Act 13 of 2012,[10] 58 Pa.C.S. §3304, and the lack of adequate measures in the statute to ensure the safety and preservation of the Commonwealth's environmental resources. *See Robinson Township*, 83 A.3d at 975 ("[D]evelopment of the natural gas industry in the Commonwealth unquestionably has and will have a lasting, and undeniably detrimental, impact on the quality of these core aspects of Pennsylvania's environment, which are part of the public trust."). Here, however, the Court cannot sustain such an inference.

Based on the averments of the PFR and the language of 52 Pa. Code §59.18, the adverse consequences, if any, of relocating a meter or meters on the outside portion of a building in one of the Historic Districts are not plain, in the

---

[9] Perhaps, this omission from the PFR could be intentional given the nature of the Municipalities' facial challenge; perhaps, it is an implicit telling as to the reason for the absence or exclusion, for, "in some circumstances, silence speaks volumes." *United States v. Suarez-Reyes*, 910 F.3d 604, 608 (1st Cir. 2018).

[10] Act of February 14, 2012, P.L. 87, 58 Pa.C.S. §§2301-3504.

obvious sense, and can only be imagined by the Court through the conjuring of mental images. Quite simply, such conjecture and speculation, reimagined into factual circumstance whereby inferences need be stacked upon inferences, are insufficient to establish that a regulation is unconstitutional on its face. *See Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 454-58 (2008); *cf. Commonwealth v. Yobbagy*, 188 A.2d 750, 752 (Pa. 1963); *Clark v. Pfizer Inc.*, 990 A.2d 17, 27-28 (Pa. Super. 2010); *Commonwealth v. Johnson*, 818 A.2d 514, 521 (Pa. Super. 2003).

In determining whether a law is facially invalid, a court cannot go beyond the law's "facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Clifton*, 969 A.2d at 1222 (internal citation and alterations omitted). To the extent that the Court can pictorialize harmful effects to the building in the Historic Districts, we can only do so by assuming and selecting arbitrary, hypothetical facts from a multitude of variables—*e.g.*, the size of the meter, what the building looks like, where the meter is located in relation to the building, whether or if the meter defaces or otherwise interferes with some sort of historical characteristic of the building and/or property, such as distinctive signage or a garden of historical significance—to create a factitious, particular set of circumstances from endless possibilities. Standing alone, this speculative imagery is not enough to give credence to the Municipalities' claim under the ERA and establish that 52 Pa. Code §59.18 causes "actual or likely deterioration," or an "unreasonable impairment" of historical values, as opposed to no "deterioration" or "impairment" whatsoever, or a relatively innocuous "deterioration" or "impairment" of those same values. *Robinson Township*, 83 A.3d at 953-54; *see also Commonwealth v. National Gettysburg Battlefield Tower, Inc.*, 302 A.2d 886, 895 (Pa. Cmwlth.) (en banc), *aff'd*, 311 A.2d

16

588 (Pa. 1973) ("It is difficult to conceive of any human activity that does not in some degree impair the natural, scenic and esthetic values of any environment. If the standard of injury to historic values is to be that expressed by the Commonwealth's witnesses as an 'intrusion' or 'distraction,' it becomes difficult to imagine any activity in the vicinity of Gettysburg which would not unconstitutionally harm its historic values."), *and compare with Feudale v. Aqua Pennsylvania, Inc.*, 122 A.3d 462, 464, 468 (Pa. Cmwlth. 2015), *aff'd*, 135 A.3d 580 (Pa. 2016) (applying the *Payne* test, *see supra* note 8, and noting the petitioner's allegations that timbering activities undertaken by a private company and the Department of Conservation and Natural Resources [DCNR] would affect "a uniquely picturesque and accessible part" of the Roaring Creek Tract and would destroy "a large swath of scenic forest and result in the degradation of the area's natural and historic aesthetic" and concluding that "[m]erely alleging that DCNR's proposed action will do harm to the Roaring Creek Tract is insufficient to establish a claim under the [ERA]").

Moreover, the Municipalities have failed to demonstrate, through well-pled facts, that in adopting 52 Pa. Code §59.18 or the Final Rulemaking Order, the PUC did not adequately consider the features surrounding the historic sites.[11] In *City*

---

[11] We are cognizant that the Municipalities baldy allege that the "[NGDC] serving the Municipalities has relocated meters to exterior locations in the Historic Districts without consideration for the Historic District Ordinances or the effect on the Historic Districts." (PFR, ¶44). However, this averment is more akin to a conclusion of law or statement regarding the state of mind of the NGDC employee who performed the relocation, both of which, without any further supporting factual allegations, need not be accepted by the Court as true for purposes of ruling on preliminary objections. *See Orange Stones Co. v. City of Reading*, 87 A.3d 1014, 1021 n.7, 1025 (Pa. Cmwlth. 2014). Regardless, the material issue in the Municipalities' claim under the ERA is whether the *PUC*, as the regulatory body that created, adopted, and enforced 52 Pa. Code §59.18, considered potential impacts to the historical values of the buildings in the Historic District. In this facial constitutional challenge, the conduct of the *NGDC*, independent of the strictures of 52 Pa. Code §59.18 and the NGDC's relationship with the PUC, is irrelevant. *See Maylie v. National*

**(Footnote continued on next page…)**

17

*of Reading*, which involved an assessment of whether a local ordinance was preempted by the amended version of 52 Pa. Code §59.18, this Court interpreted the regulation and noted that it expressly "states that inside meter location 'shall be considered' for buildings in historic districts, provided that the regulator and a shut-off valve are installed outside." 179 A.3d at 625 (citing 52 Pa. Code §59.18(d)(1)(ii), (2), (3)). After determining that 52 Pa. Code §59.18 preempted a local ordinance, either through the concept of conflict preemption or field preemption, we addressed the City of Reading's argument "that preemption [did] not apply because the location of meters in historic districts implicates its protection of historic resources under Article I, Section 27 of the Pennsylvania Constitution." *City of Reading*, 179 A.3d at 631.

> In rejecting the City's contention, this Court stated as follows:
>
> Article [I], Section 27 can bar preemption of local regulation where the state statute or regulation on which preemption is based so completely removes environmental protections that it violates the state's duties under that constitutional provision. The reason that preemption fails in such a case is that the preempting state law itself is unconstitutional. That situation is not present here. The City does not claim that PUC Regulation 59.18 [52 Pa. Code §59.18] violates Article [I], Section 27 or is unconstitutional in any respect. *Nor is there any basis on which a court could conclude that the PUC's safety regulation of gas meters violates Article [I], Section 27 of the Pennsylvania Constitution, as it in fact takes into*

(continued…)

*Railroad Passenger Corp.*, 601 A.2d 308, 313 (Pa. Super. 1991) (concluding that "state action" is generally required for a cause of action arising under the Pennsylvania Constitution); *Western Pennsylvania Socialist Workers 1982 Campaign v. Connecticut General Life Insurance. Co.*, 485 A.2d 1, 5-6 (Pa. Super. 1984) (finding that to state a claim for a constitutional violation, the complainant must allege sufficient "state action").

18

> *account the interest in protection of historic resources by providing for consideration of indoor meter placement in historic districts.* 52 Pa. Code §59.18(d)(ii).

*City of Reading*, 179 A.3d at 631-32 (internal citation omitted) (emphasis added).

Although the Municipalities argue that the above passage from *City of Reading* is non-binding *dicta*, and even assuming they are correct in this regard, we nonetheless "find that it is persuasive *dicta* in light of the language of [52 Pa. Code §59.18]." *Swink v. Workmen's Compensation Appeal Board (Burrell Construction & Supply Co.)*, 510 A.2d 860, 863 (Pa. Cmwlth. 1986). In our view, the panel in *City of Reading* engaged in a straightforward reading and construction of the pertinent provisions of 52 Pa. Code §59.18, which reflect that the PUC did, in fact, "consider" and, also, compelled an NGDC to "consider" ("shall consider"), whether a building was or is located in a historic district in determining whether a meter should or could stay in the inside part of the building.

Moreover, in the Final Rulemaking Order, (44 Pa.B. 5835, Sept. 13, 2014), the PUC discussed the numerous arguments advanced by a variety of historical commissions with respect to historical buildings. *Id.* at 5-6. The PUC noted that "[t]he recommendation has been made that the regulations should develop requirements for relocating meters and regulators outside in locally designated historic districts and provide alternatives for typical historic building types." *Id.* at 17. The PUC addressed these concerns by referring to the bases for permitting a meter line to be located inside a structure, *e.g.*, when protection from ambient temperatures is necessary to avoid meter freeze-ups; a utility determines that a meter is subject to a high risk of vandalism based on the utility's prior experience; a utility determines that an outside meter location is neither feasible nor practical; and when a building is located in a historic district. *Id.* at 17. The PUC then stated that, based on these provisions, 52 Pa. Code §59.18 does contain "guidelines for relocating meters

19

outside which would apply to outside meters in locally designated historic districts." *Id.*; *see id.* at 3 ("Allowance for inside meter and regulator sets are based upon historic area prohibitions . . . .").[12] By noting that a building's historical significance is one of the several exceptions to the requirement that meters be placed outside of a building, the PUC "considered" the impact that 52 Pa. Code §59.18 may have on the Commonwealth's historic resources.

Under the ERA, "when [the PUC] acts, the action must, on balance, reasonably account for the [historical] features of the affected locale." *Robinson Township*, 83 A.3d at 951. Here, the Municipalities have not averred any adverse, visual effects to a historic resource when a meter is relocated outside, and the PUC ostensibly left it to the discretion of the NGDC to contemplate "visual impact alternatives that may avoid or minimize the impact of installing the meter and/or regulator outside." Final Rulemaking Order, at 17. Our Supreme Court has been careful to note that the rights conferred by the ERA are "amenable to regulation" and that only regulations that "unreasonably impair the right[s] are unconstitutional."

---

[12] Nonetheless, the PUC "decline[d] to address visual impact alternatives that may avoid or minimize the impact of installing the meter and/or regulator outside" and decided to "not attempt to set what may be subjective requirements that would avoid or minimize the impact to an historic resource." Final Rulemaking Order, at 17. Instead, the PUC stated that it was expecting and relying upon "a gas utility or any utility to provide reasonable and adequate service when installing its equipment" and stressed that, under the amended regulation, "property owners, as well as utility customers, [will] be notified of neighborhood projects," including meter line relocation. *Id.* Importantly, 52 Pa. Code §59.18(a)(3) provides: "The written notice must inform the customer and building owner of the equipment that the utility proposes to relocate, the planned new location and how to contact the utility to provide supplemental information that the utility may not have, such as the building's historic status. The written notice must include contact information for the Commission's Bureau of Consumer Services." *Id.* Apparently, this notice leaves open the possibility that an NGDC and/or the Bureau of Consumer Services and the owner of a historic building will work together or exchange dialogue in determining whether the meter line should be relocated outside and, if so, at which particular place, based upon subjective and intangible factors related to the aesthetic value of the building.

*PEDF*, 161 A.3d at 931. At the same time, the duties to conserve and maintain natural resources under the ERA "do not require a freeze of the existing public natural resource stock" and "are tempered by legitimate state interests." *Robinson Township*, 83 A.3d at 958.

Here, the underlying reasons for the 2014 amendment to 52 Pa. Code §59.18(a), as stated by the PUC, are as follows:

> The [PUC] is [] concerned about the number of reportable incidents resulting, at least partially, from locating meters and regulators inside structures. The gas distribution utilities reported more than 4,000 leaks occurring on inside meter sets over a five[-]year period. The number of reportable incidents (65) over the past forty years, however, is more alarming. While it appears from the data that the inside meter and regulators were not always the primary factor for accidents, locating meters and regulators inside certainly contributed to these incidents through a release of natural gas. State and federal gas safety regulations require gas utilities to perform leak surveys over service lines periodically; however, several of the utilities reported that they could not comply with the leak survey requirements when the meter and regulator are inside a building which prevents access. This is troubling because the state and federal regulations require leak surveys up to the meter. By not having access to the meter sets, the NGDCs cannot comply with the state and federal regulations and cannot detect inside leaks.
>
> The state has experienced several gas explosions related to steel service lines being struck and pulled up from their stable position and subsequently pulling the service line from the inside meter set. Plastic service lines with inside meter sets do not pull away since the excavation equipment usually severs the line immediately after being struck. The combination of steel service line and inside meter set is a high risk factor for natural gas incidents.

21

Final Rulemaking Order, at 3.[13] It is beyond cavil that public safety is a weighty, legitimate state interest. *See Robinson Township*, 83 A.3d at 946; *Pennsylvania Department of Transportation v. Clayton*, 684 A.2d 1060, 1063 (Pa. Cmwlth. 1996); *cf. Commonwealth v. Bell*, 516 A.2d 1172 (Pa. 1986).

After reviewing the relevant factors and mode of analysis for an ERA claim, we conclude that the PUC engaged in measures that reasonably accounted for the historical features of buildings located in Historic Districts. Indeed, the mere fact that a structure has been designated under the Act as being a historical resource automatically and unconditionally mandates that the NGDC consider keeping the meter line inside. This aspect of 52 Pa. Code §59.18, in conjunction with the lack of any averments to demonstrate visual or otherwise negative impacts to historic resources when meters are installed outside, leads us to conclude that the Municipalities have failed to state a valid claim that 52 Pa. Code §59.18, on its face, violates the ERA.

In sum, to prevail on a facial challenge to a regulation, the petitioner must convince a court that the "constitutional deficiency is so evident that proof of actual unconstitutional applications is unnecessary." *Clifton*, 969 A.2d at 1223 n.37. "A [law] is facially unconstitutional only where no set of circumstances exist under which the [law] would be valid." *Id.* at 1222. As explained previously, the Municipalities are requesting this Court to engage in imaginative speculation as to the aesthetic or visual harm posed by relocation of the meter, and by no means is it a sure (or even likely) thing that a vast majority of meter relocations will bring about this

---

[13] We do not reproduce and cite this passage from the Final Rulemaking Order to prove the factual content and details therein, but simply to show the PUC's overall, stated intent for revising 52 Pa. Code §59.18 and formulating the general rule that, unless an exception applies, meters shall be located outside and aboveground.

harm. *See Key Realty Co. Zoning Case*, 182 A.2d 187, 195 n.6 (Pa. 1962) ("It is difficult to imagine a more variable, uncertain fluctuating standard than 'aesthetic' value. In many instances, scarcely a dozen people can agree on what is or is not aesthetic—it depends entirely on each individual's artistic tastes or personal predilections, and even these views, like the views on modernistic paintings, have only 'a fleeting moment's duration.'"). To the contrary, it is quite fathomable that there may be instances where the relocation does not have any discernable, adverse impact to the building, such as, for example, where the meter is located in an area that the public is unable to readily view. But, insofar as the Court can imagine that such harm can or could occur, it is just as likely that it would not. Critically, where the averred facts equally support two or even more inferences, the facts prove neither or none of those inferences. *See Commonwealth v. Borrin*, 12 A.3d 466, 475 (Pa. Super. 2011) (en banc), *aff'd*, 80 A.3d 1219 (Pa. 2013).

Therefore, we grant the PUC's first PO and, in doing so, dismiss Count I with prejudice.[14]

## The PUC's Remaining PO's—Nos. 2-6

Having dismissed Count I with prejudice, we now evaluate the PUC's remaining POs to determine whether Count II should be dismissed.

## PO No. 2

In its second PO, the PUC contends that the Municipalities have failed to exhaust administrative remedies.

---

[14] Our conclusion, of course, does not bar the Municipalities from seeking to amend their PFR to assert an as-applied challenge to 52 Pa. Code §59.18.

"It is well settled that when an adequate administrative remedy exists, this Court lacks jurisdiction to entertain a suit in either law or equity. The doctrine of exhaustion of administrative remedies requires a party to exhaust all adequate and available administrative remedies before the right of judicial review arises." *Pennsylvania Independent Oil and Gas Association v. Department of Environmental Protection*, 135 A.3d 1118, 1129 (Pa. Cmwlth. 2015) (en banc) (*PIOGA*) (internal citations omitted), *aff'd*, 161 A.3d 949 (Pa. 2017).

The PUC contends that the Municipalities did not "plead facts demonstrating that they have applied for the indoor gas meter exception with their respective NGDCs pursuant to 52 Pa. Code §59.18(d)." (PUC's Br. at 16.) The PUC continues,

> Accordingly, it is not apparent that the regulation they seek to enjoin the Commission from enforcing has been enforced against them. Only after the Municipalities make such an application to the NGDC can the NGDC approve or deny the indoor gas meter application. Upon such a denial, the Municipalities can seek Commission review under Section 701 of the Pennsylvania Public Utility Code, 66 Pa.C.S. §701, of the NGDC's determination.

(PUC's Br. at 16.)

The PUC further asserts that, "if the Municipalities are dissatisfied with a [PUC] staff determination made under Section 59.18, they may file a Petition for Review of staff action pursuant to 52 Pa. Code §5.44." *Id.*

We disagree. First, as correctly noted by the Municipalities in their brief, 52 Pa. Code §59.18(d) "contains no procedures whatsoever with respect to the placement of meters on historic properties. To the contrary, the decision of where to place a meter on a historic property is left entirely to the discretion of the utility."

24

(Municipalities' Br. at 24.) Although, as mentioned above in footnote 12, *see infra* note 12, it is possible that the owners of the historic buildings may discuss the location of the meter with the NGDC as part of the notice process, 52 Pa. Code §59.18(d) does not appear to have a formal, adjudicative process. Most notably, contrary to that argued by the PUC, there is no formal application procedure embedded within 52 Pa. Code §59.18. Further, in light of the plain language of 52 Pa. Code §59.18(d), an NGDC is not required to set forth the basis or reasons for its determination as to whether a meter should be located inside or outside a structure. In short, the Municipalities cannot exhaust an administrative procedure that is seemingly nonexistent.

> Second, 52 Pa. Code §5.44 states in pertinent part,
>
> (a) Actions taken by staff, other than a presiding officer, under authority delegated by the Commission, will be deemed to be the final action of the Commission unless reconsideration is sought from the Commission within 20 days after service of notice of the action, unless a different time period is specified in this chapter or in the act.
>
> (b) An action taken by staff under delegated authority will note the parties' right to seek reconsideration of the action under this section.
>
> (c) Petitions for reconsideration from the actions of the staff will be addressed by the Commission at public meeting.

52 Pa. Code §5.44(a)-(c).

However, assuming, for the sake of the argument, that an NGDC is part of the PUC's "staff," there is nothing in 52 Pa. Code §59.18 that requires an NGDC to inform the Municipalities of a right to contest the action, via reconsideration, and, at this stage in the proceedings, the pleadings are devoid of any allegation that the

NGDC provided notice to the Municipalities that they have a right to seek reconsideration under 52 Pa. Code §5.44. Notably, the Municipalities have averred that under 52 Pa. Code §59.18, the PUC vested absolute, unfettered, and unreviewable discretion in an NGDC when deciding whether to perform a meter relocation. (PFR, ¶¶23, 55.) Moreover, the Final Rulemaking Order states that "the utility will continue to retain discretion in applying this regulation," *id.* at 1, admits that "the regulation does contain provisions that delegate discretion to the utility in making a determination with respect to locating an outside meter," *id.* at 26, and confirms that "due to [a utility's] public safety obligations," "it is necessary that . . . the utility be allowed to make the final decision." *Id.*; *cf.* 1 Pa. Code §35.20 (Appeals from actions of staff) ("Actions taken by a subordinate officer under authority delegated by the agency head may be appealed to the agency head by filing a petition within 10 days after service of notice of the action."). As such, accepting the well-pled facts as true, as we are required to do, the PUC's proposed administrative procedure is neither available nor adequate.

Third, the Municipalities have lodged a facial challenge in Count II under the Declaratory Judgments Act. In *PIOGA*, this Court noted that "there are several exceptions to th[e] doctrine that, if applicable, would allow a petitioner to file a [petition for review] in this Court's original jurisdiction under the Declaratory Judgments Act." 135 A.3d at 1129.

> Three relevant exceptions to the exhaustion of administrative remedies are recognized for constitutional attacks. The first exception is where the jurisdiction of an agency is challenged. The second exception is where the constitutionality of a statutory scheme or its validity is challenged. The third exception is where the legal or equitable remedies are unavailable or inadequate, or the administrative agency is unable to provide the requested

26

relief. Under the third exception, even though an administrative agency may not have jurisdiction over all constitutional issues raised by a litigant, the litigant must first exhaust its administrative remedies where there is no separate allegation that the available statutory remedy is inadequate.

*Empire Sanitary Landfill, Inc. v. Department of Environmental Resources*, 684 A.2d 1047, 1054-55 (Pa. 1996).

Here, although the PUC "has some authority in certain cases to consider constitutional questions concerning regulations within its jurisdiction, [i]t does not . . . have the power to grant declaratory judgment and injunctive relief pursuant to the Declaratory Judgment[s] Act . . . because only courts of record of the Commonwealth have that jurisdiction." *PIOGA*, 135 A.3d at 1129. Having sufficiently alleged that the procedures documented by the PUC are neither available nor adequate, the Municipalities do not have to exhaust an administrative process prior to commencing their facial challenge in our original jurisdiction. *See id.* at 1129-30; *see also Empire Sanitary Landfill*, 684 A.2d at 1055. Otherwise, there is an exception to the doctrine of exhaustion of administrative remedies, where, as here, the petitioner has lodged a facial challenge "to the constitutionality of the [] regulation as a whole." *Funk v. Department of Environmental Protection*, 71 A.3d 1097, 1102 (Pa. Cmwlth. 2013) (internal citation and quotation marks omitted).

Accordingly, based on these legal precepts, we overrule the PUC's second PO.

**PO No. 3**

In its third PO, the PUC asserts that the Municipalities failed to join the NGDCs, which allegedly relocated the meter lines in the Historic Districts, as a necessary and/or indispensable party. The PUC argues that the NGDCs must comply

27

with federal regulations and, if the NGDCs are not joined in this suit, they would be prejudiced and subjected to conflicting obligations, and their "interest in complying with other statutory and regulatory mandates would be neglected." (PUC's Br. at 19.) More precisely, the PUC contends that

> [g]as meter location is an essential part to the safe and reliable operation of gas service, and excluding NGDCs from this proceeding would prejudice the affected NGDCs from being able to argue their case with respect to the requirements under Federal pipeline safety and the Public Utility Code . . . . [T]he due process rights of the affected NGDCs would be violated if this matter proceeded without them because taking away the NGDCs' ability to review gas meter location could cause the NGDCs to violate other statutes and regulations as previously discussed.

*Id.*

A party is indispensable when its "rights are so connected with the claims of the litigants that no decree can be made without impairing those rights." *Rachel Carson Trails Conservancy, Inc. v. Department of Conservation and Natural Resources*, 201 A.3d 273, 279 (Pa. Cmwlth. 2018). "Thus, the main inquiry for determining whether a party is indispensable involves whether justice can be accomplished in the absence of the party." *Id*.

We consider the following guidelines in determining whether a party is indispensable:

> (1) Do absent parties have a right or interest related to the claim?
>
> (2) If so, what is the nature of the right or interest?
>
> (3) Is that right or interest essential to the merits of the issue?

28

(4) Can justice be afforded without violating due process rights of the absent parties?

*CRY, Inc. v. Mill Service, Inc.*, 640 A.2d 372, 376 (Pa. 1994). The basic inquiry in an indispensable analysis is whether justice can be done in the absence of a third party. To conduct an accurate analysis, this Court must "refer to the nature of the claim and the relief sought." *Id.* at 376.

In *Hommrich v. Pennsylvania Public Utilities Commission* (Pa. Cmwlth., No. 674 M.D. 2016, filed July 28, 2017) (unreported),[15] the petitioner filed a petition for review in our original jurisdiction against the PUC seeking relief under the Declaratory Judgments Act. He contended that certain regulations of the PUC pertaining to net metering were unauthorized under the Alternative Energy Portfolio Standards Act (AEPS Act).[16] The petitioner planned on and took steps toward building solar facilities, and the project was within the service territory of Pennsylvania's electric distribution companies (EDCs). The petitioner alleged that his facilities would generate excess energy, which, in turn, would be sold to an EDC. The PUC filed POs, asserting, *inter alia*, that the petitioner failed to join the EDC as an indispensable party because the EDC provides net metering as a service and purchases excess energy at a retail rate.

In overruling the PO, this Court concluded:

> Here, according to the PUC, the identity and joinder of the EDC is necessary because the challenged regulations would not apply to customers served by rural electric cooperatives and municipal electric systems. However, the PUC's assertion fails to accept as true [the petitioner's] well-pled allegation that the proposed projects "are within the service

---

[15] We cite *Hommrich* for its persuasive value in accordance with Section 414(a) of this Court's Internal Operating Procedures, 210 Pa. Code §69.414(a).

[16] Act of November 30, 2004, P.L. 1672, *as amended*, 73 P.S. §§1648.1-1648.8.

29

territory of Pennsylvania EDCs." [The petitioner] also alleges that he "does not seek to build his facilities in any service territory where net metering is not available pursuant to the AEPS Act." [The petitioner] seeks a declaration regarding the validity of the PUC's regulations. His challenge is a question of law that is not dependent on the location of his planned projects in a particular EDC service territory or the identity of the EDC to which [the petitioner's] alternative energy systems would interconnect and to which he would sell his excess energy. Although an EDC is the entity responsible for approving or denying an application for net metering depending if the applicant qualifies under the law, the EDCs do not have a right or interest regarding the validity of the regulations . . . . The EDCs merely apply the law in effect when ruling on the applications. Thus, we conclude that the EDC is not an indispensable party to this litigation and overrule this objection.

*Hommrich*, slip op. at 17-18 (internal citations omitted).

In our view, the parallels between *Hommrich* and this case are compelling. Akin to the situation in *Hommrich*, where the petitioner challenged the PUC's regulations and the EDC implemented those regulations, here, the Municipalities are contesting the constitutionality of 52 Pa. Code §59.18, and the NGDCs execute, or put into operation, the regulation. Also, both the NGDCs and the EDCs are charged with "merely applying the law in effect" when deciding meter location and processing an application, and neither one has or had "a right or interest regarding the validity of the regulations." *Hommrich*, slip op. at 18. Notably, the Municipalities seek an order declaring 52 Pa. Code §59.18 unconstitutional and are not pursuing relief against the NGDCs themselves. To the extent that the PUC contends the NGDCs are indispensable parties because they would not be able to argue their case with respect to the requirements under federal law, this issue is irrelevant to Count II and has no bearing on whether 52 Pa. Code §59.18 constitutes an unlawful sub-delegation of legislative authority.

30

Hence, we overrule the PUC's third PO.

## PO Nos. 4 and 6[17]

In its fourth PO, the PUC contends that the Municipalities have failed to aver facts demonstrating direct and immediate harm and the existence of an actual controversy. In its sixth PO, the PUC reiterates, in substance, the same allegations, but adds that, because there is no actual controversy, Count II seeks an advisory opinion.

We dispose of these contentions summarily. "[I]n order for a challenge to be justiciable in this Court, there must be a promulgation of regulations the effect of which is direct and immediate." *Zinc Corp. of America v. Department of Environmental Resources*, 603 A.2d 288, 290 (Pa. Cmwlth. 1992). "Only where there is a real controversy may a party obtain a declaratory judgment." *South Butler County School District*, 587 A.2d 699, 701 (Pa. 1991); *see also Office of Governor v. Donahue*, 98 A.3d 1223, 1230-31 (Pa. 2014).

In the PFR, the Municipalities allege the NGDCs serving their areas have commenced a meter relocation program pursuant to the amended version of 52 Pa. Code §59.18 and relocated meters from the interior of buildings to the exterior of buildings in their Historic Districts. (PFR, ¶¶21-22.) In Count II, the Municipalities assert that the NGDC lacks the legal power to take such action because 52 Pa. Code §59.18 constitutes an unlawful sub-delegation of legislative authority.

Ergo, as alleged by the Municipalities, 52 Pa. Code §59.18 was and is in effect and has been implemented by both the PUC and NGDCs. The Municipalities further allege that an NGDC has already relocated meters in the Historic Districts,

---

[17] We will address PO No. 5 *infra*.

31

resulting in a change in the status quo and discernable modifications to historical buildings, which was done pursuant to an allegedly unconstitutional scheme. Ultimately, these averments demonstrate an actual controversy, immediate harm, and do not require this Court to issue an advisory opinion, *i.e.*, an opinion based on hypothetical facts that do not or may not ever occur. *See Crystal Lake Camps v. Alford*, 923 A.2d 482, 489 (Pa. Super. 2007).

For these reasons, the Court overrules the PUC's fourth and sixth POs.

## PO No. 5

Finally, the PUC contends that the Municipalities have failed to aver facts sufficient to justify pre-enforcement review. To the contrary, 52 Pa. Code §59.18 has been applied and enforced against the Municipalities and, as previously explained, the alleged post-enforcement procedure of the PUC is neither available nor adequate. In any event, "this Court has jurisdiction to conduct pre-enforcement review of a regulation if the administrative remedy is either unavailable or inadequate and the effect of the regulation on the party seeking review is direct and immediate." *Rouse & Associates-Ship Road Land Limited Partnership v. Pennsylvania Environmental Quality Board*, 642 A.2d 642, 647 (Pa. Cmwlth. 1994). Having already determined that the Municipalities need not exhaust administrative remedies to move forward on Count II, and that they have already been subjected to and experienced harm as a result of 52 Pa. Code §59.18 (albeit not in the ERA sense, but in the sense that a "fixture" has been attached to the building), the PUC's arguments lack merit.

Therefore, the Court overrules the PUC's fifth PO.

## Conclusion

Having concluded that the Municipalities have failed to state a claim upon which relief can be granted, we sustain the PUC's first PO and dismiss Count I of the PFR with prejudice. Because we have determined that the PUC's five other POs lack merit, and do not necessitate the dismissal of Count II, the Court permits Court II to proceed, and the PUC shall file an answer within 30 days of the accompanying order.

_____

PATRICIA A. McCULLOUGH, Judge

33

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

City of Lancaster, Borough of Carlisle, :
and Borough of Columbia, :
                Petitioners :
                 :   No.  251 M.D. 2019
          v. :
                 :
Pennsylvania Public Utility :
Commission, :
             Respondent :

## ***ORDER***

AND NOW, this 21st day of February, 2020, the preliminary objections of the Pennsylvania Public Utility Commission (PUC) to the petition for review (PFR) filed by the City of Lancaster, Borough of Carlisle, and Borough of Columbia are GRANTED in part and OVERRULED in part, and Count I of the PFR is hereby DISMISSED with PREJUDICE.  The PUC is directed to file an answer to the PFR within 30 days of the date of this order.

_____
PATRICIA A. McCULLOUGH, Judge